NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

PREMIER HEALTH ASSOCIATES, LLC,

        Plaintiff,

v.

MEDICAL TECHNOLOGY SOLUTIONS, *et al.*

        Defendants.

Civil Action No. 17-331(JLL)

OPINION

**LINARES**, Chief District Judge

This matter comes before the Court by way of Defendants Medical Technology Solutions and Byte Sized Solutions' motions to dismiss certain counts of Plaintiff Premier Health Associates, LLC's First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF Nos. 65, 66). Plaintiff has filed oppositions and Defendants have submitted their replies thereto. (ECF Nos. 71, 72, 75, 76). The Court has read the parties' submissions and considers this matter without oral argument in accordance with Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court denies Defendants' motions to dismiss.

## I. BACKGROUND[1]

Plaintiff is a healthcare provider with several offices in northern New Jersey. (ECF No. 55 ("FAC") ¶ 11). Defendant Medical Technology Solutions ("MTS") provides data storage, hardware, and support to healthcare providers, as well as various healthcare-related information

---

[1] This background is derived from Plaintiff's First Amended Complaint, which the Court must accept as true at this stage of the proceedings. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009).

technology services to the public. (FAC ¶ 16). Defendant Byte Sized Solutions ("Byte") is also a healthcare information technology company that offers healthcare-related information technology services to the public. (FAC ¶ 17). Prior to the events giving rise to this case, Plaintiff and MTS had entered into a hosting agreement. (FAC ¶¶ 20–23). Pursuant to this agreement, "MTS provided Plaintiff with data warehousing, hardware and support, hosting for NextGen (a brand of computer software used by physicians to track all aspects of patient care) and managed services" for a monthly fee. (FAC ¶ 24).

Because Plaintiff was formed as the result of the merger of two healthcare providers, its various practice locations used different electronic health record management systems. (FAC ¶¶ 19, 30). Some of those practices used the aforementioned NextGen system, while others used Allscripts. (FAC ¶ 30). Around April 2015, Plaintiff sought to convert all of its patient data to one system, and discussed the conversion of that data from NextGen to Allscripts with MTS. (FAC ¶ 31). On April 29, 2015, Plaintiff's Chief Technology Officer sent an email to MTS's Director of Sales, Michael Spencer, confirming a conference call to "discuss starting the process for migrating patient data." (ECF No. 65-4 at 2). That same day, Mr. Spencer replied to that email asking if Plaintiff had "someone that is going to take the data into Allscripts," and that MTS has "Allscripts expertise if needed." (ECF No. 65-4 at 2).

On June 2, 2015, based upon Mr. Spencer's representations in the April 29 email, Plaintiff entered into an agreement with MTS for the conversion of its patient data from NextGen to AllScripts. (FAC ¶ 34). Plaintiff alleges that despite Mr. Spencer's representations, MTS did not in fact have the expertise required to convert the patient data and had never performed this type of conversion before. (FAC ¶ 33). Due to MTS's lack of the necessary expertise, it contracted with Byte to convert Plaintiff's data from NextGen to Allscripts. (FAC ¶ 43). Byte,

however, was also not an expert in this type of data conversion and needed to purchase a "document conversion tool" to do the job. (FAC ¶ 44).

After Plaintiff requested a performance guarantee from MTS, Byte's President, Steve Buttitta, guaranteed to MTS that the data conversion would be done properly. (FAC ¶¶ 45–46). MTS subsequently guaranteed the performance of the data conversion to Plaintiff. (FAC ¶ 47). MTS then put Byte in direct contact with Plaintiff, and the two parties communicated with each other throughout the conversion process. (FAC ¶¶ 50-51). These communications included representations from Byte to Plaintiff about the scope of its work and the successful completion of the data conversion. (FAC ¶ 52).

Ultimately, MTS and Byte failed to successfully convert Plaintiff's patient data from NextGen to Allscripts, resulting in "irrevocably altered" patient data, some of which was entered into the wrong patient's chart, while other data was lost or overwritten. (FAC ¶¶ 56–67). The conversion failure affected up to 187,000 patient charts, and Allscripts advised Plaintiff that the only way to ensure the ongoing validity and accuracy of their patient's data moving forward was to create a new database. (FAC ¶¶ 71–73).

Plaintiff then filed suit against MTS in the Superior Court of New Jersey, Sussex County on December 16, 2016. (ECF No. 1 at 2). MTS subsequently removed this action to this Court on January 17, 2017. (ECF No. 1 at 2). On February 6, 2018, Plaintiff filed its FAC, adding Byte as a defendant, and pleading six claims against MTS alone, one claim against Byte alone, and two claims against MTS and Byte together. MTS now moves to dismiss Counts V and VI of the FAC (violation of the New Jersey Consumer Fraud Act ("NJCFA") and fraudulent inducement, respectively), and Byte moves to dismiss Counts VII, VIII, and IX of the FAC

3

(violation of the NJCFA, negligent misrepresentation, and common law negligence, respectively).

## II. LEGAL STANDARD

To withstand a motion to dismiss for failure to state a claim, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the Court must take three steps. "First, it must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, '[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679) (citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

4

## III. DISCUSSION

### A. <u>Plaintiff's Claims against MTS</u>

1. *NJCFA*

"To state a prima facie case under the [NJCFA], a plaintiff must allege three elements: '(1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff[']s ascertainable loss.'" *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 333 (D.N.J. 2014) (citations omitted) (quoting *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009)). The type of unlawful conduct that violates the NJCFA "fall[s] into three general categories: affirmative acts, knowing omissions, and regulation violations." *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 17 (1994). Plaintiff alleges that MTS violated the NJCFA by "making knowing misrepresentations and/or omissions to Plaintiff with the intent that it would rely upon them in connection with the" agreement to convert Plaintiff's patient data. (FAC ¶ 127).

MTS argues that Plaintiff's NJCFA claim should be dismissed for three reasons: (1) the April 29, 2015 email sent to Plaintiff by Mr. Spencer is not an actionable misrepresentation or material omission under the NJCFA; (2) the NJCFA does not apply to the conversion of Plaintiff's data, because such a service does not constitute "merchandise" under the NJCFA; and (3) Plaintiff has not pled its NJCFA claim with the requisite particularity under Federal Rule of Civil Procedure 9(b). (ECF No. 65-1 at 17–18). Each of these arguments fails for the reasons set forth below.

  a. <u>Whether the April 29, 2015 email is an actionable misrepresentation</u>

MTS argues single statements like the one line promoting MTS's expertise in Allscripts data conversion in Mr. Spencer's April 29, 2015 email are insufficient to give rise to liability

5

under the NJCFA. (ECF No. 65-1 at 21–23). This is not the case. It is clear from the language used by the New Jersey Supreme Court that a single statement may give rise to liability under that statute. For example, the Court writes that, "*[a]n* offense arises under the [NJCFA] from *an* affirmative act, *an* omission, or *a* violation of an administrative regulation. One who makes *an* affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive." *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 605 (1997) (emphasis added) (citations omitted). The Court clearly contemplated that liability under the NJCFA could arise from a single affirmative misrepresentation, and such isolated statements have been found to constitute "sufficient evidence from which a reasonable jury could conclude that [the defendant] engaged in an affirmative misrepresentation." *Sarlo v. Wells Fargo Bank, N.A.*, 175 F. Supp. 3d 412, 426–27 (D.N.J. 2015) (coming to this conclusion regarding the defendant's assurance to the plaintiffs that "it would have a decision within six to twelve weeks about a loan modification"). Thus, the fact that Plaintiff's NJCFA claim is based off of one line in an email is not a sufficient basis for this Court to dismiss Plaintiff's NJCFA claim.

MTS also argues that it is not subject to liability under the NJCFA because Plaintiff initiated the discussion regarding the data conversion with MTS. (ECF No. 65-1 at 22–23). The Court need not rule on whether the NJCFA applies to non-soliciting merchants, as it is unclear at this point of the litigation which party actually initiated the discussion regarding the data conversion. The April 29, 2015 email from Dr. Kim to Mr. Spencer was "to confirm [their] teleconference," which Dr. Kim was "glad [they] were finally able to set . . . up." (ECF No. 65-4 at 2–3). This email indicates that there were prior discussions between Plaintiff and MTS regarding the data conversion and it is possible that MTS initiated those conversations.

MTS also contends that because it "transparently disclosed the involvement of Byte in the conversion process," it cannot be liable under the NJCFA as it was "not seeking to deceive [Plaintiff] in any way." (ECF No. 65-1 at 24). However, "when the alleged consumer-fraud violation consists of an affirmative act [such as a misrepresentation], intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act." *Cox*, 138 N.J. at 17–18. That MTS was not seeking to deceive Plaintiff is thus of no moment at this stage of the litigation.

Finally, MTS argues that Mr. Spencer's claim that MTS has "Allscripts expertise if needed," is puffery and thus not actionable under the NJCFA. (ECF No. 65-1 at 24). It is true that puffery is not actionable under the NJCFA. *Lieberson v. Johnson & Johnson Consumer Cos.*, 865 F. Supp. 2d 529, 540 (D.N.J. 2011). "Advertising that amounts to 'mere' puffery is not actionable because no reasonable consumer relies on puffery. The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions." *Id.* (quoting *In re Toshiba Am. HD DVD Mkt. and Sales Practice Litig.*, No. 08-939, 2009 WL 2940081, at *10 (D.N.J. Sept. 11, 2009)); *see also Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993) (holding that a claim that "is both specific and measurable" is more than mere puffery); *U.S. Healthcare, Inc., v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir. 1990) (defining puffing as advertising "that is not deceptive for no one would rely on its exaggerated claims" (quoting *Toro Co. v. Textron, Inc.*, 499 F. Supp. 241, 253 n.23 (D. Del. 1980))). Similar statements to those made by Mr. Spencer, such as "affirmative misrepresentations about [a] builder's experience and qualifications as well as the quality of his homes," have been considered more than mere puffery. *Gennari*, 148 N.J. at 606–07. As such, this Court will not dismiss Plaintiff's NJCFA claim against MTS on the grounds

that Mr. Spencer's email was mere puffery, and, as explained above, MTS's other arguments concerning Mr. Spencer's email fail to convince the Court that such an email is unactionable under the NJCFA.

   b. Whether the Conversion Agreement Constitutes the Sale of Merchandise

Under the NJCFA, "merchandise" is defined as "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c). MTS argues that its agreement to convert Plaintiff's patient data from NextGen to Allscripts cannot give rise to liability under the NJCFA because such an agreement does not constitute the sale of "merchandise," specifically because the conversion service "was not a service offered to the public for sale." (ECF No. 65-1 at 26–27). Plaintiff has pled that "MTS offers healthcare-related information technology services to the public, including the extraction and transfer of [electronic health records.]" (FAC ¶ 16). The question then, is whether the particular data conversion service that MTS offered to Plaintiff sufficiently constitutes a service offered to the public for sale.

While the service MTS offered Plaintiff was a relatively customized product tailored to Plaintiff's existing electronic health records, similar services have fallen within the scope of the NJCFA. *See CDK Global, LLC v. Tulley Auto. Grp., Inc.*, No. 15-3103, 2016 WL 1718100, at *6 (D.N.J. Apr. 29, 2016) (refusing to dismiss an NJCFA claim on a transaction concerning "the lease of computer equipment and the installation of a computer software system," that "might be 'only suited to the needs of a limited clientele'" (quoting *Prescription Counter v. AmerisourceBergen Corp.*, No. 04-5802, 2007 WL 3511301, at *14 (D.N.J. Nov. 14, 2007))); *Dreier Co. v. Unitronix Corp.*, 218 N.J. Super. 260, 263–64, 272–73 (App. Div. 1986) (finding that misrepresentations regarding the sale of computer system with "custom programmed

8

software" were covered by the NJCFA). Additionally, the issue of whether the conversion agreement falls within the scope of the NJCFA "is better left for summary judgment or trial." *Hatteras Press, Inc. v. Avanti Comp. Sys. Ltd.*, No. 16-5420, 2017 WL 2838349, at *3 (D.N.J. June 30, 2017) (determining that "[c]ourts evaluating these questions have generally relied on discovery records"); *see also Reckitt Benckiser LLC v. Cotiviti, LLC*, No. 16-729, 2016 WL 5791410, at *4 (D.N.J. Oct. 3, 2016) ("[T]he issue of whether [the defendants'] services constituted merchandise offered to the public presents factual issues that exceed the scope of a motion to dismiss," because such "services may be standard ones, offered to multiple customers on similar terms; or they may be wholly unique, negotiated on an individual basis between sophisticated entities; or they may lie somewhere on a continuum between those two extremes"); *Princeton Healthcare Sys. v. Netsmart N.Y., Inc.*, 422 N.J. Super. 467, 473–74 (App. Div. 2011) (relying on the record compiled in discovery in determining that the "heavily negotiated contract between two sophisticated corporate entities [did] not constitute [the] 'sale of merchandise within the intent of the CFA'"). As such, Plaintiff has sufficiently pled that the conversion agreement is a sale of merchandise to the public at this stage of the litigation.

    c. <u>Whether Plaintiff Has Pled Its NJCFA Claim with the Requisite Particularity</u>

MTS next argues that Plaintiff has failed to plead its NJCFA claim with the particularity required by Federal Rule of Civil Procedure 9(b). (ECF No. 65-1 at 32–34). Rule 9(b) applies to claims pled under the NJCFA. *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). To satisfy the pleading requirements for fraud under Rule 9(b), "the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.*; *see also Reckitt Benckiser*, 2016 WL 5791410, at *4

("'A plaintiff must allege the 'who, what, when, where, and how of' a NJCFA claim." (quoting *Crozier v. Johnson & Johnson Consumer Cos.*, 901 F. Supp. 2d 494, 506 (D.N.J. 2012))).

MTS argues that Plaintiff has failed to properly plead the alleged unlawful conduct, and it has not pled any casual connection between the unlawful conduct and the ascertainable loss with the requisite particularity. (ECF No. 65-1 at 33–34). As this Court has already determined, the April 29, 2015 is an actionable misrepresentation under the NJCFA for the purposes of this motion. *See supra* part III.A.1.a. Furthermore, the necessary who, what, when, where, and how elements of a pleading under Rule 9(b) are present with respect to the alleged unlawful conduct. Mr. Spencer sent an email containing a statement allegedly mispresenting that MTS had experience with NextGen to Allscripts data conversion on April 29, 2015. Such precision places MTS on notice of the "precise misconduct with which [it is] charged." *Frederico*, 507 F.3d at 200 (quoting *Lum v. Bank of Am.*, 361 F.2d 217, 224 (3d Cir. 2004), *abrogated on other grounds by Twombly*, 550 U.S. 544).

With regard to the causal connection, MTS alleges that "[t]he only factual allegation in the FAC that even remotely addresses a causal connection is as follows: 'On or about June 2, 2015 – and based upon MTS's representation that it had the required expertise – Plaintiff entered into' the Conversion Agreement." (ECF No. 65-1 at 33–34) (quoting FAC ¶ 34). MTS argues that this does not meet the heightened pleading standard of Rule 9(b). (ECF No. 65-1 at 34). "To establish causation, a consumer merely needs to demonstrate that he or she suffered an ascertainable loss 'as a result of' the unlawful practice." *Lee v. Carter-Reed Co., L.L.C.*, 203 N.J. 496, 522 (2010) (quoting N.J.S.A. 56:8-19). The NJCFA does not require a showing of reliance to prove causation. *Id.* For example, allegations "where the consumer urges that his purchase was the 'but-for' consequence of the seller's unlawful conduct, suffice under the

NJCFA's causal nexus requirement." *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 304 (D.N.J. 2009). In *Arcand*, the Court found that the amended complaint, which alleged that the consumers "would not have purchased new cartridges for their BIC printers had it not been for BIC's misrepresentations that the toner cartridge [was] empty," sufficiently pled a causal nexus under the NJCFA and Rule 9(b). *Id.* Here, the FAC alleges that "based upon MTS's representation that it had the required expertise – Plaintiff entered into an agreement with MTS for the conversion of its patient data." (FAC ¶ 34). Thus, Plaintiff has "alleged a connection between their decision" to enter into the conversion agreement "and the supposed misrepresentation" that MTS had the necessary expertise to perform the conversion. *Arcand*, 673 F. Supp. 2d at 304.

2. *Fraudulent Inducement*

To state a claim for fraudulent inducement under New Jersey law, Plaintiff must allege: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari*, 148 N.J. at 610 (citing *Jewish Ctr. of Sussex Cty. v. Whale*, 86 N.J. 619, 624–25 (1981)). MTS argues that Plaintiff's fraudulent inducement claim fails for the same reasons that Plaintiff's NJCFA claim fails: namely that the email from Mr. Spencer to Dr. Kim was an ordinary business communication or mere puffery, and because Plaintiff has not pled its fraudulent inducement claim with the requisite particularity.

Plaintiff has properly pled its fraudulent inducement claim for the same reasons that this Court determined that Plaintiff has adequately pled its NJCFA claim. The Court has already determined that Mr. Spencer's email to Dr. Kim contains a material misrepresentation, and that

11

this alleged misrepresentation has been pled with particularity. "Malice, intent, knowledge and other conditions of mind of a person may be averred generally." *Frederico*, 507 F.3d at 200. Plaintiff has thus sufficiently pled that MTS held itself out as having expertise in NextGen to Allscripts data conversion, even though it did not perform that type of conversion, and did so with the intent to secure Plaintiff's business. (FAC ¶¶ 32–34, 43–47). The Court has also established that Plaintiff has adequately pled a causal nexus between the alleged misrepresentation and damages. Although the stand for establishing a causal nexus is not as strict as reliance, whether reliance was reasonable is a question for the jury, *see, e.g.*, *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 219 F. Supp. 2d 600, 610 (D.N.J. 2002); *Richie and Pat Bonvie Stables, Inc. v. Irving*, 350 N.J. Super. 579, 589 (App. Div. 2002). Lastly, MTS does not contest that Plaintiff suffered damages, and Plaintiff has pled that it lost nearly 200,000 patient charts and significant time and money trying to recover or repair its patient data. Therefore, MTS's motion to dismiss Plaintiff's fraudulent inducement claim fails.

### B. Plaintiff's Claims against Byte

1. *NJCFA*

Byte argues that Plaintiff fails to state an NJCFA claim against it because the allegations against Byte are inapplicable to the NJCFA, and because it fails to properly plead an NJCFA claim under Rule 9(b). (ECF No. 66-1 at 14–18). Byte contends that the NJCFA does not apply to its conduct because it "did not sell or advertise anything to [Plaintiff]." (ECF No. 66-1 at 16). Byte's initial indirect relationship with Plaintiff does not absolve it of liability under the NJCFA. *See, e.g.*, *Jefferson Loan Co. v. Session*, 397 N.J. Super. 520, 535–36 (App. Div. 2008) ("We have previously interpreted the CFA as not requiring direct contractual privity between the consumer and the seller of the product or service, thereby allowing indirect suppliers, 'whose

products are passed onto a buyer and whose representations are made to or intended to be conveyed to the buyer,' to be sued under the [NJCFA]." (quoting *Perth Amboy Iron Works, Inc. v. Am. Home Assurance Co.*, 226 N.J. Super. 200, 211 (App. Div. 1988), *aff'd* 118 N.J. 249 (1990))). Furthermore, Plaintiff is correct that the NJCFA does not just apply to the initial contract, but that it also applies to the subsequent performance of that contract. *Weiss v. First Unum Life Ins. Co.*, 482 F.3d 254, 266 (3d Cir. 2007).

Plaintiff alleges three instances where Byte's conduct amounts violates the NJCFA. Byte's president issued a performance guarantee to MTS "to secure the contract," Byte misrepresented the scope of its work under the conversion agreement, and Byte misrepresented the scope of the data conversion failure. (ECF No. 72 at 22). Byte's initial performance guarantee was intended to be passed on to Plaintiff, and the other two alleged misrepresentations occurred during the subsequent performance of the contract. Thus, as Byte's alleged misconduct is covered by the NJCFA, the Court turns to whether Plaintiff has adequately plead the alleged misconduct under Rule 9(b).

As to the performance guarantee, Plaintiff pleads that on May 26, 2015, Byte's President, Steve Buttitta, issued a performance guarantee to MTS after Plaintiff requested such a guarantee from MTS. (FAC ¶¶ 45–46). This pleading "inject[s] precision or some measure of substantiation" into the underlying fraud and places Byte on notice of the "precise misconduct with which [it is] charged." *Frederico*, 507 F.3d at 200 (quoting *Lum*, 361 F.2d at 224).

Byte contests whether Plaintiff has properly plead the causal connection between Mr. Buttitta's guarantee and its ascertainable loss, because the original Verified Complaint and the attached conversion agreement state that such agreement as entered into on May 19, 2015, while Byte's performance guarantee was issued on May 26, 2015. (ECF No. 66-1 at 15–16). The

Verified Complaint has been supplanted by the FAC, which alleges that the conversion agreement was entered into on June 2, 2015, (FAC ¶ 34), and the conversion agreement attached to the Verified Complaint is unsigned and undated, except for a draft date on the front page, (ECF No. 1 at 52, 55). As the Court must accept the facts in the FAC as true, the conversion agreement was entered into after MTS conveyed the performance guarantee to Plaintiff, and after Plaintiff's request for such a guarantee. Thus, Plaintiff has adequately pled the causal connection between Byte's performance guarantee and the loss of the patient data. *See Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 437 (D.N.J. 2012) (noting that a plaintiff's losses "must be 'particularly proximate to a misrepresentation or unlawful act of the defendant condemned by the [NJCFA].'" (quoting *Meshinsky v. Nichols Yacht Sales, Inc.*, 110 N.J. 464, 473 (1988))).

Byte's alleged misrepresentation of the scope of its work arises from an email sent by Daniel Bakmaz, Byte's Director of Clinical Solutions, dated July 1, 2015. In that email, Mr. Bakmaz wrote to Plaintiff that he "agreed to build the interface between PM and EHR if it was not configured correctly in test." (FAC ¶ 53). Byte then "asked Plaintiff for access to the Allscripts Interface Engine ('AIE'), where Byte could configure the interface as expressly represented in Mr. Bakmaz's July 1, 2015 email." (FAC ¶ 54). As a result of this request, Plaintiff granted Byte full access to the AIE, but Byte failed to successfully complete the data conversion. (FAC ¶¶ 55–56).

Byte argues that Mr. Bakmaz's email constitutes a conditional statement, and thus cannot constitute an actionable misrepresentation. (ECF No. 66-1 at 17). This Court disagrees. Mr. Bakmaz's email is written in the past tense, indicating that he had, in fact, agreed to build that interface, subject to the correct configuration in test. Whether or not that test actually happened, and its results, are questions for discovery, and are not appropriate for the Court to address at this

stage. Furthermore, whether Mr. Bakmaz's email "is, in fact, deceptive," should not be decided in a motion to dismiss. *Leon v. Rite Aid Corp.*, 340 N.J. Super 462, 472 (App. Div. 2001).

Finally, Plaintiff alleges that Byte lied "about the disastrous extent of its failure to perform." (ECF No. 72 at 25). "Based upon its discussions with MTS and Byte," Plaintiff believed the conversion issues were routine errors. (FAC ¶ 62). Plaintiff later realized the full extent of the damage to its patient data. (FAC ¶¶ 64–74). Byte also later informed MTS that the proper configuration of the AIE was not within the scope of the work it agreed to perform after it was advised of the linking logic issues. (FAC ¶ 75). Plaintiff argues that this shows Byte never intended to properly configure the AIE, rendering Mr. Bakmaz's email a misrepresentation of the scope of its intended work. (ECF No. 72 at 22). Plaintiff has thus pled with particularity an allegedly actionable misrepresentation arising out of the subsequent performance of the conversion agreement. *See Weiss*, 482 F.3d at 266 (stating that the NJCFA covers fraud "in the subsequent performance (where the seller at some point elects not to fulfill its obligations)").

2. *Negligent Misrepresentation*

A claim for negligent misrepresentation under New Jersey Law requires: "(1) an incorrect statement (2) negligently made, (3) upon which a plaintiff justifiably relied, (4) and which resulted in economic loss or injury as a consequence of that reliance." *Sarlo*, 175 F. Supp. 3d at 425. The Court has already established that Plaintiff has pled allegedly incorrect statements that resulted in economic loss as a consequence of its reliance on those statements. Thus, the question is whether the alleged statements were negligently made, and whether Plaintiff's reliance on those statements was justifiable.

Plaintiff has adequately pled that it was negligent for Byte's president to issue a performance guarantee on the data conversion project when it had no experience converting

NextGen data to Allscripts, and when it had to buy a conversion tool, which it did not already own, to convert said data. Furthermore, as explained above, Plaintiff has pled that Byte's statements about its intent to configure the AIE and the scope of the damage to the patient data were misrepresentations, as Byte did not believe that the proper configuration of the AIE was within the scope of its work, and because it knew about the actual magnitude of the lost data. Thus, Plaintiff has adequately stated a claim of negligent misrepresentation.

Byte also argues that Plaintiff's negligent misrepresentation claim must fail because Plaintiff entered the conversion agreement based on MTS's representations, not Byte's. As explained above, Plaintiff alleges that Byte conveyed the performance guarantee to MTS, which MTS conveyed to Plaintiff at Plaintiff's request. This type of indirect reliance is sufficient to plead a claim of negligent misrepresentation. *See Kaufman v. i-Stat Corp.*, 165 N.J. 94, 109–11 (2000) (holding that a false statement conveyed to another party can establish indirect reliance, which is sufficient to establish a claim for negligent misrepresentation so long as a second party to the transaction "actually hears the substance of the misrepresentation, by means however attenuated, and considers the actual content of that misrepresentation when making the decision to complete the transaction").

Lastly, Byte's argument that Plaintiff fails to meet the Rule 9(b) standard in pleading its negligent misrepresentation claim fails, as Rule 9(b) only applies to claims of negligent misrepresentation that sound in fraud. *Marrin v. Capital Health Sys., Inc.*, No. 14-2558, 2015 WL 404783, at *9 (D.N.J. Jan. 29, 2015). This is not the case where, as here, the negligent misrepresentation claim is "specifically alleged as a separate claim . . . notwithstanding the significant overlap in allegations between the claims." *Donachy v. Intrawest U.S. Holdings, Inc.*, No. 10-4038, 2012 WL 869007, at *5 (D.N.J. Mar. 14, 2012).

### 3. *Negligence*

Plaintiff alleges that Byte was negligent in converting the patient data in that Byte "failed to follow the required steps" and certain best practices, such as "using incorrect matching criteria and importing data into Allscripts in an inappropriate manner." (FAC ¶¶ 57–58). Specifically, "the linking logic (known as the 'Paris Rule') between the demographics side of the database and the clinical side of the database was set an inappropriate level in the AIE." (FAC ¶ 59). Plaintiff claims that the Paris Rule "determines the level of similarity that needs to exist between certain data points . . . in order to generate a match." (FAC ¶ 59).

To establish a claim for negligence under New Jersey law, Plaintiff must plead: "(1) a duty of care owed to the plaintiff by the defendant; (2) that defendant breached that duty of care; (3) that plaintiff's injury was proximately caused by defendant's breach." *Smith v. Kroesen*, 9 F. Supp. 3d 439, 442 (D.N.J. 2014). Whether or not a party owes another a duty of care is a question of law. *Degelman v. Lincoln Nat'l Life Ins. Co.*, No. 16-286, 2016 WL 3456920, at *7 (D.N.J. June 21, 2016). The determination of whether a duty of care is owed is based on several factors including: (1) the foreseeability of harm; (2) the relationship of the parties; (3) the nature of the attendant risk; (4) the opportunity and ability to exercise care; and (5) the public interest in the proposed solution. *Carvalho v. Toll Bros. and Developers*, 143 N.J. 565, 572–73 (1996).

Here, the foreseeability of harm to the Plaintiff and the nature of the risk are fairly obvious. Plaintiff alleges that the conversion process requires the adherence to a set of certain best practices, which Byte allegedly did not follow. The consequence of not following those best practices would clearly be an increased risk of damaging the underlying data. The relationship of the parties is not contractual. Plaintiff did not contract directly with Byte, as MTS contracted with Byte to perform the data conversion, though Plaintiff and Byte were in direct

communication with each other throughout the project. Thus, Byte was aware that it was performing work that would ultimately be for the benefit of Plaintiff. Byte also had adequate opportunity and ability to exercise care. It could have followed the best practices prescribed by Allscripts for its data conversion, and it could have made sure that the Paris Rule was at the appropriate level for the conversion project.

Finally, the public interest in the solution is significant. Not only are patient health records valuable, confidential information protected by federal statute, but allowing any party to skirt liability for its allegedly negligent performance of a project for a non-contracting third party is contrary to public policy and leaves the injured non-contracting party without remedy under the law. This is why it is "uniformly held that an independent contractor is liable to a third person injured as a result of the negligence of the independent contractor or his servants in the performance of his work for the contractee in an action based in tort." *Bacak v. Hoya*, 4 N.J. 417, 422 (1950). Thus, Byte owed Plaintiff a duty. Whether that duty was breached, and whether it was the proximate cause of Plaintiff's injury are questions for the jury. *See Perez v. Wyeth Labs., Inc.*, 161 N.J. 1, 27 (1999) ("Ordinarily, issues of proximate cause are considered to be jury questions."); *Cassanello v. Luddy*, 302 N.J. Super. 267, 276 (App. Div. 1997) (holding that the complaint should not have been dismissed, in part, because whether a duty is breached is a question for the jury). Accordingly, Plaintiff has adequately pled its negligence claim.

## IV. CONCLUSION

For the reasons stated above, the Court denies Defendants' motions to dismiss. An appropriate Order accompanies this Opinion.

Dated: August 23, 2018

_____
JOSE L. LINARES
Chief Judge, United States District Court